### COOK *et al., vs.* BIDDLE *et al.*

By the 9th Art. of the treaty concluded at Washington, on the 28th March, 1836, between the United States and the Ottawa and Chippewa nations of Indians, after reciting that the Indians felt a strong consideration for aid rendered by certain of their half-breeds, and that wishing to testify their gratitude, had assigned such individuals certain locations of land, and that they had united in a strong appeal for the allowance of the same in the treaty, and that no such reservations could be permitted in carrying out the instructions of the President; it was agreed that, in addition to the general fund set apart for half-breeds in the sixth article of the treaty, the sum of $48,148 should be paid for the relinquishment of this class of claims, to be divided in the following manner, and among others: " To John A. Drew, for a tract of one section and three quarters, to his Indian family, at Cheboygan Rapids, at the rate of four dollars" an acre: *Held,* That the money was given to him absolutely, and not in trust, for his Indian family.

Appeal from Wayne Circuit Court in, Chancery.

*J. M. Howard,* for complainants.

*Goodwin,* for defendants.

By the Court, GREEN, J.

The only question of any difficulty presented by the demurrer to complainant's bill, depends upon the construction to be given to the IXth article of the treaty concluded at Washington on the 28th of March, 1836, between the United States and the Ottawa and Chippewa nations of Indians.

Was the money by that article stipulated to be paid to John A. Drew by the United States, for a tract of land assigned to his Indian family by the Ottawas and Chippewas, paid to him in trust for such family, or was it for his own benefit?

The article of the treaty referred to, reads as follows:

"Whereas, the Ottawas and Chippewas, feeling a strong consideration for aid rendered by certain of their half-breeds on Grand River, and other parts of the country ceded, and wishing to testify their gratitude on the present occasion, have assigned such individuals certain locations of land, and united in a strong appeal for the allowance of the same in this treaty; and whereas, no such reservations can be permitted in carrying out the special instructions of the President on this subject, it is agreed that in addition to the general fund set apart for half-breed claims, in the sixth article, the sum of forty-eight thousand one hundred and forty-eight dollars shall be paid for the relinquishment of this class of claims, to be divided in the following manner: To Rix Robinson, in lieu of a section of land granted to his Indian family, on the Grand River rapids, (estimated by good judges to be worth half a million,) at the rate of thirty-six dollars an acre; to Leonard Slater, in trust for Cheminonoquat, for a section of land above said rapids, at the rate of ten dollars an acre; to John A. Drew, for a tract of one section and three-quarters, to his Indian family, at Cheboigan rapids, at the rate of four dollars; to Edward Biddle, for one section to his Indian family, at the fishing grounds, at the rate of three dollars; to John Holiday for five sections of land to five persons of his Indian family, at the rate of one dollar and twenty-five cents; to Eliza Cook, Sophia Biddle and Mary Holiday, one section of land each, at two dollars and fifty cents; to Augustin Hamelin June, being of Indian descent, two sections, at one dollar and twenty-five cents; to William Lasley, Joseph Daily, Joseph Trotier, Henry A. Lenake, for two sections

each, for their Indian families, at one dollar and twenty-five cents; to Luther Rice, Joseph Laframbois, Charles Butterfield, being of Indian descent, and to George Moran, Louis Moran, G. D. Williams for half-breed children under their care, and to Daniel Marsac, for his Indian child, one section each, at one dollar and twenty-five cents."

By a supplemental article, it is further stipulated that none of the half-breeds or blood relatives of the said tribes, commuted with under the provisions of the ninth article, shall have any further claim on the general commutation fund set apart to satisfy reservation claims in the sixth article.

The inducement set forth in the ninth article, for assignment of certain locations of land by these nations, was the strong consideration they felt for aid rendered by certain of their half-breeds, and their wish to testify their gratitude on the occasion of making the treaty; and they profess to have made such assignment to the individuals who had rendered such aid. A very slight examination of the subsequent provisions of this article, however, will show that such assignments were not only not limited to those who might have rendered them aid, but that they were not limited to half-breeds. Thus, a section of land is assumed to have been granted to the Indian family of Rix Robinson. That family consisted of his Indian wife and half-breed children; and so grants of land are assumed to have been made to six other Indian families. It can hardly be supposed each member of all these families had rendered such aid to their Indian relatives, as thus to call forth the gratitude of the nations to whom they were allied. So, also, grants are assumed to have been made to six individuals, who are described as being of Indian descent, and are evidently not half-breeds. This further appears from the language of the supplemental article before referred to, in which half-breeds and *blood relatives* are mentioned as having been commuted with under the provisions of the ninth article, and are alike excluded from any further claim on the general commutation fund. Again, grants are assumed to have been made to half-breed children under the care of these several individuals, and to the Indian child of another. Had these children rendered such aid to the Ottawa and Chippewa nations of Indians, as to entitle them to claim this gratitude? The idea is wholly inadmissible.

From this brief examination of some of the provisions of the ninth article of the treaty, it is perfectly clear, to my apprehension, that although gratitude for aid rendered by certain of their half-breeds was the inducement for the Indians to make the assignments of land, and to stipulate for the payment of money by the United States, instead of sanctioning their grants; yet, that the assignments were not made, nor was the money to be paid to, or for the use of, the individual half-breeds who had rendered such aid. If I am correct in this proposition, it follows as a necessary sequence, that no presumption or implication of an intended trust arises from any supposed claim on the part of the assumed assignees, or obligation on the part of the assignors.

The Indians had no power to dispose of the fee of their lands, except to the United States, without the concurrence of the Government in such disposition. The President had instructed the commissioner who was empowered to conclude the treaty, not to assent to any assignment or grant of lands by the Indians. The Indians, either voluntarily, or through the influence of others, propose to set apart and reserve certain tracts of land for certain families and individuals, and unite in a strong appeal for the allowance thereof in the treaty. This is forbidden; but it is agreed that a portion of the moneys to be paid as the consideration of the cession made to the United States by the treaty, shall be paid for the extinguishment of this class of claims. The division of the money is then agreed upon, and the particular distribution to be made of it is stipulated for in the treaty. Does it follow that this money should be distributed to the particular families or individuals for whom the lands were designed? Not, it seems to me, necessarily so. Land is a permanent thing, and not so likely to be wasted as money, by the improvidence of the Indian or his descendant. It is recited in the sixth article, that the Indians held in higher consideration some of their half-breeds than others, and that there is much difference in their capacity to use and take care of property, and provision is therein made for dividing them into three classes, one of which was to consist of such as should be judged incapable of making a proper use of the money allowed them. The assignments of land proposed to be made by the two nations, was a free gift, prompted by gratitude alone. The

proposed recipients of their bounty were not all of them at least the individuals whose acts had inspired this emotion in the unsophisticated hearts of the Indians. But they could testify their gratitude by bestowing a benefit upon such as had rendered them aid, also upon such as might, from the circumstances in which they were placed, and the education they were likely to receive in the arts of civilization, be capable of rendering them aid in the future. When money was to be substituted in the place of lands, it still remained for the Indians to determine upon the distribution of it. In doing so, they may be supposed to have considered what application or distribution of it would best accomplish the objects they had in view; but the conclusion at which they arrived must be determined by the language of the treaty, in which it is expressed. For this purpose, it is unquestionably proper to look to the whole treaty, and to make available all the aid it can afford in throwing light upon the question under examination. Considerable stress has been laid by the counsel for the complainants, upon the language of the supplementary article of the treaty, which was added "to guard against misconstruction of some of the foregoing provisions, and to secure, by further limitations, the just rights of the Indians." The language relied upon, as tending to establish the trust, is the following: "Nor shall any of the half-breeds, or blood relatives of the said tribes, commuted with under the provisions of the ninth article, have any further claim on the general commutation fund set apart to satisfy reservation claims, in the said sixth article." It is claimed that the word "commutation," in this connexion, means the giving of one thing for another, as between the U. S. and those for whom the land was designed. This cannot be. The assumed assigners or grantors are no parties to the treaty. The lands are ceded to the government by the two nations at large through their representatives. The assumption, then, that these persons have been commuted with, throws no light upon the true construction of the ninth article. It is perhaps, not improper here to remark, that much of the language of this treaty is so loose that to give it a strictly legal and grammatical construction, would involve the most palpable contradictions and absurdities. Several examples of this character have already been adverted to, and many more might easily be pointed out. But suppose the word "commutation," to have been ap-

35

propriately used according to its ordinary signification, yet that signification is satisfied, whether the thing given for another is given to the one from whom that other is received, or to a third person.

But why, it is asked, should the money paid in lieu of a tract of land granted to an Indian family, be given to the head of such family? and how does such a gift testify the gratitude of the Indians for aid rendered by their half-breeds? If it were necessary these questions might be readily answered. If they felt a strong consideration for aid rendered by certain of their half-breeds, they well might, and undoubtedly did also feel a strong consideration for the white traders who resided amongst them, and had identified themselves with their interests by marrying Indian wives, and rearing and educating families of half-breed children amongst them, who would probably be capable of rendering them important services thereafter. By proposing to grant to such families certain tracts of land, it does not seem to me improbable that they intended to embrace the heads of the families within that term, and that such grants were intended by them for the direct benefit of the father as well as the children. Assuming that the language does not import a trust, I can see nothing at all inconsistent with the expressed motives of the Indians, in giving the money to the father, as the most certain and prudent means of benefitting the children. He was responsible for their education and support, and it is not at all singular that they should be willing to rely upon the natural instinct of paternity to impel the father to do justice to his children.

Of the sum set apart by the ninth article, there was to be divided "To John A. Drew, for a tract of one section and three quarters, to his Indian family, at Cheboygan rapids, at the rate of four dollars." This language does not express a trust, nor does it seem to me to import any intention to create a trust. The word "for," in this clause, means "in lieu of," or "in the place of;" and "assigned," is understood, and must be supplied in the reading, before the words "to his Indian family." If a trust had been intended, it might easily have been expressed thus: "To John A. Drew, in trust for his Indian family, for a tract, &c., assigned to them." It cannot be supposed that language expressive of a trust, was omitted through inattention or inadvertence, for in the same article several trusts are expressed. The money to be divided to Slater,

is declared to be "in trust for Cheminonoquat," and that to be divided to Lasley, Daily, Trotier, and Lenake, is declared to be "for their Indian families." That divided to George Moran, Louis Moran, and G. D. Williams, was "for half-breed children under their care," and that divided to Marsac, was "for his Indian child." The conclusion deduced from comparing these several clauses seems to be almost irresistible, that the omission of any such words in the case of Drew, Robinson, Biddle, and Holliday, was intentional, and that they were *carefully* excluded. This view is further strengthened by another fact appearing upon the face of the same article. There was to be paid "to Eliza Cook, Sophia Biddle, and Mary Holliday, one section of land each, at two dollars and fifty cents." Whether Sophia Biddle and Mary Holliday, were members of the Indian families of Edward Biddle and John Holliday, respectively, we have no means of knowing, and probably no right to infer; but that Eliza Cook is a half-breed daughter of John A. Drew, appears from the bill of complaint in this cause, and is admitted by the demurrer. But it is said it does not appear that the Eliza Cook named in the treaty, and Eliza Cook, one of the complainants in this suit, are the same person. If they were different persons, and both embraced in the provisions of the ninth article of the treaty, as the complainants contend, it is highly probable that they would have been distinguished from each other. If the Indians intended to confer a benefit upon each of them, both must have been known to the Indians, and the necessity for distinguishing them would be apparent. Nothing being alleged to the contrary, the inference is that they are the same person.

The decree of the Circuit Court for the County of Wayne in Chancery, must be affirmed, with costs to the appellees.

Decree affirmed.

Whipple, C. J., dissented.